# EXHIBIT A

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A5805ABA

# PURCHASE AND SALE AGREEMENT

**for**

**The Respective "Properties" listed below (collectively, the "Property")**

| Sellers | Properties |
|---|---|
| **Heisler Laguna, LLC**, a Delaware limited liability company | **305, 331, 345, 353, 369, 385, and 397 N. Pacific Coast Highway, Laguna Beach, California** |
| **694 NCH Apartments, LLC**, a Delaware limited liability company | **694 N. Coast Highway, Laguna Beach, California** |
| **Retreat at Laguna Villas, LLC**, a Delaware limited liability company | **729 Ocean Front, Laguna Beach, California** |
| **Sunset Cove Villas, LLC**, a Delaware limited liability company | **683 Sleepy Hollow Ln, Laguna Beach, California** |
| **Duplex at Sleepy Hollow, LLC**, a Delaware limited liability company | **689 Sleepy Hollow Ln, Laguna Beach, California** |
| **Cliff Drive Properties DE, LLC**, a Delaware limited liability company | **150-154 Cliff Drive, Laguna Beach, California** |
| **Laguna Festival Center, LLC**, a Delaware limited liability company | **805-809 Laguna Canyon Road, Laguna Beach, California** |
| **891 Laguna Canyon Road, LLC**, a Delaware limited liability company | **891 Laguna Canyon Road, Laguna Beach, California** |
| **777 at Laguna, LLC**, a Delaware limited liability company | **777 and 22446 Laguna Canyon Road, Laguna Beach, California** |
| **Laguna Art District Complex, LLC**, a Delaware limited liability company | **775-793 Laguna Canyon Road, Laguna Beach, California** |

**By and Between**

**The Respective "Sellers" listed above**

**(collectively, "Seller")**

**and**
**Special Assets Laguna LLC,**
**a Delaware limited liability company**

**("Buyer")**

**November 6, 2025**

1

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

## TABLE OF CONTENTS

**Page**

1.  Defined Terms; Interpretation..................................................................................1
    (a)   Defined Terms ...........................................................................................1
    (b)   Interpretation ............................................................................................3
2.  Agreement to Purchase ....................................................................................3
3.  Purchase Price ...................................................................................................4
    (a)   Purchase Price ...........................................................................................4
    (b)   Earnest Money ...........................................................................................4
    (c)   Independent Contract Consideration.........................................................4
4.  Escrow and Closing ..........................................................................................5
    (a)   Escrow........................................................................................................5
    (b)   Closing .......................................................................................................5
    (c)   Seller Closing Deliveries ...........................................................................5
    (d)   Buyer Closing Deliveries ...........................................................................6
    (e)   Return of Closing Deliveries .....................................................................6
    (f)   Deliveries Outside of Escrow ....................................................................6
    (g)   Deliveries Upon Close of Escrow..............................................................6
5.  Delivery of Due Diligence Materials; Feasibility Period ................................7
    (a)   Due Diligence ............................................................................................7
    (b)   Termination Right.......................................................................................7
    (c)   Return of Reports .......................................................................................8
    (d)   Service Contracts .......................................................................................8
    (e)   Proprietary Information; Confidentiality ...................................................8
    (f)   No Representation or Warranty by Seller...................................................8
    (g)   Buyer's Responsibilities ............................................................................9
    (h)   Buyer's Agreement to Indemnify ..............................................................9
6.  Seller's Conditions............................................................................................9
7.  Buyer's Conditions ...........................................................................................10
8.  Title And Survey...............................................................................................10
    (a)   Title Report ................................................................................................10
    (b)   New or Updated Survey.............................................................................10
    (c)   Title Review ...............................................................................................11

i

|     | (d) | Amended Commitment | 11 |
| 9.  |     | Closing Costs and Prorations | 11 |
|     | (a) | Closing Costs | 12 |
|     | (b) | Prorations | 12 |
| 10. |     | Representations and Warranties | 12 |
|     | (a) | Seller's Representations and Warranties | 12 |
|     | (b) | Buyer's Representations and Warranties | 13 |
|     | (c) | Disclaimers | 15 |
|     | (d) | Release | 17 |
|     | (e) | Survival | 18 |
| 11. |     | Specific Rights and Obligations | 18 |
|     | (a) | Maintenance of Insurance | 18 |
|     | (b) | Conduct of Business | 18 |
|     | (c) | Leasing | 19 |
| 12. |     | Remedies | 19 |
|     | (a) | SELLER'S REMEDIES | 19 |
|     | (b) | Buyer's Remedies | 19 |
|     | (c) | Limitation on Liability | 20 |
| 13. |     | Brokerage | 20 |
| 14. |     | Possession | 21 |
| 15. |     | Casualty and Condemnation | 21 |
|     | (a) | Notice of Casualty or Condemnation | 21 |
|     | (b) | Casualty Losses | 21 |
|     | (c) | Condemnation | 21 |
| 16. |     | Consequences of Termination | 22 |
| 17. |     | Miscellaneous | 22 |
|     | (a) | Survival | 22 |
|     | (b) | Attorneys' Fees | 22 |
|     | (c) | Notices | 22 |
|     | (d) | Parties Bound | 23 |
|     | (e) | Construction | 23 |
|     | (f) | Counterparts | 23 |
|     | (g) | Entirety and Amendments | 24 |

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

| (h) | Invalidity | 24 |
|-----|-----------|-----|
| (i) | Assignment | 24 |
| (j) | Governing Law | 24 |
| (k) | No Liability of Related Parties | 24 |
| (l) | Waiver of Jury Trial | 25 |
| (m) | Time | 25 |
| (n) | Confidentiality | 25 |
| (o) | No Recordation | 25 |
| (p) | Further Assurances | 25 |
| (q) | Joint and Several Liability | 25 |
| (r) | Natural Hazards Disclosure | 25 |
| (s) | Alternative Dispute Resolution | 26 |

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A580F4BA

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of November 6, 2025, is between HEISLER LAGUNA, LLC, a Delaware limited liability company; 694 NCH Apartments, LLC, a Delaware limited liability company; Retreat at Laguna Villas, LLC, a Delaware limited liability company; Sunset Cove Villas, LLC, a Delaware limited liability company; Duplex at Sleepy Hollow, LLC, a Delaware limited liability company; Cliff Drive Properties DE, LLC, a Delaware limited liability company; Laguna Festival Center, LLC, a Delaware limited liability company; 891 Laguna Canyon Road, LLC, a Delaware limited liability company; 777 at Laguna, LLC, a Delaware limited liability company; and Laguna Arts District Complex, LLC, a Delaware limited liability company; ("Seller"), and Special Assets Laguna LLC, a Delaware limited liability company ("Buyer").

1.     Defined Terms; Interpretation.

(a)     Defined Terms. Definitions of certain defined terms are provided throughout the text of this Agreement. Defined terms listed in this Section 1 have the meaning assigned to them below.

"Buildings" means the buildings, if any, located on the Land situated in Orange County, California and commonly known as 305, 301, 345, 353, 369, 385, and 397 N. Coast Highway; 694 N. Coast Highway; 729 Ocean Front; 683 Sleepy Hollow Lane; 689 Sleepy Hollow Lane; 150-154 Cliff Drive; 805-809 Laguna Canyon Road; 891 Laguna Canyon Road; 777 and 22446 Laguna Canyon Road; and 775-793 Laguna Canyon Road.

"Business Day" means any day, Monday through Friday, that the national banks and the County Recorder in Orange County, California are open for business. Whenever under the terms of this Agreement the time for performance of any act, covenant or condition or the expiration of any time period falls on a day that is not a Business Day, such expiration time or time for performance shall be extended to the next Business Day.

"Closing Date" has the meaning given that terms in Section 4(b).

"Effective Date" means the day this Agreement is executed by both parties and counterpart copies are exchanged by the parties.

"Environmental Law" means any law relating to the protection of the environment or, to the extent related to environmental conditions, human health or safety, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended; the Hazardous Materials Transportation Act, as amended; the Resource Conservation and Recovery Act, as amended; the Toxic Substances Control Act, as amended; the Federal Water Pollution Control Act, as amended; and similar laws of the State of California.

"Feasibility Period" means the period commencing on the Effective Date and ending at 5:00 p.m., Pacific time, twenty-one (21) days after the Effective Date.

"Hazardous Materials" means (a) any substance that constitutes hazardous materials, hazardous waste or toxic waste within the meaning of any Environmental Law or that otherwise is

subject to regulation under any Environmental Law and (b) regardless of whether it is so classified, any radioactive material, radon, mold, mildew, microorganisms, asbestos, any medical waste, polychlorinated biphenyls (PCBs), lead-based paint, urea formaldehyde foam insulation and petroleum or petroleum derivatives.

"Improvements" means all buildings, structures, parking areas, sidewalks, landscaping and other improvements located on the Land.

"Information" means all information, documents, plans, specifications, pictures, projections and other written or verbal information and materials that is not in the public domain and that is furnished to Buyer or any of its subsidiaries or affiliates or any of their respective employees, representatives or agents by Seller or its Related Entities or any partner, member, officer, director, trustee, agent, employee or other person acting or purporting to act on behalf of Seller or any of its Related Entities (including any materials delivered in accordance with Section 5(a)), together with any excerpt from or copy of such information that is prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives and all written, diskettes or electronically stored or transmitted documentation furnished to or prepared by Buyer or any of its subsidiaries or affiliates or any of their respective employees, agents or representatives based upon or derived from, reflecting or incorporating, in whole or in part, such information.

"Intangibles" means all right, title, interest and estate of Seller, if any, in, to and under (a) all Service Contracts, (b) all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, granted by governmental authorities, and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties covering all or any part of the Property, other than those, if any, made by Buyer or a Related Entity (collectively, the "Guaranties"). Intangibles shall not include, and Buyer shall not utilize any internet addresses or websites used in connection with the Property. The terms of the foregoing sentence shall survive Closing. Notwithstanding any other provision hereof, Seller makes no representation or warranty relating to the assignability of any of the Service Contracts, Guaranties or other Intangibles and shall not be required to obtain any consents relating to any such assignment.

"Land" means the tract or tracts of land described in Schedule 1 attached hereto, and all riparian rights, privileges, rights of way and easements in any way pertaining thereto, all right, title and interest in and to any adjoining sidewalk and in and to any adjoining street or alley ("Appurtenant Rights").

"Permitted Exceptions" means (a) preprinted standard exceptions on the Title Policy, other than those removed pursuant to an ALTA Extended Coverage policy; (b) exceptions approved or deemed approved by Buyer pursuant to Section 8(c) of this Agreement; (c) any matters that would be disclosed by a survey of the Property; (d) property taxes and assessments which are not delinquent as of Closing; and (e) matters created by Buyer or any of its affiliates or any of their respective representatives, consultants or contractors.

"Personalty" means all fixtures, equipment, machinery, building materials, supplies, inventory and other tangible property owned by Seller, used in connection with the ownership,

2

maintenance, use, leasing, service or operation of the Land or Improvements, and located on the Land or to be located on the Land on the Closing Date, but specifically excluding (i) any personal property which is owned by any party to a Service Contract; and (ii) any computer software which either is licensed to Seller, or which Seller deems proprietary.

"Property" means the Land, the Improvements, the Intangibles, the Personalty, the Related Assets, and the Appurtenant Rights, collectively.

"Related Assets" means all right, title, interest and estate of Seller in, to all Intangibles.

"Related Entities" or a "Related Entity" means, with respect to any Person, all direct and indirect affiliates and subsidiaries thereof, all entities related thereto and all partners, shareholders, members, directors, officers, trustees, managers, authorized agents and employees thereof.

"Service Contracts" means the contracts to which Seller is a party relating to the operation, maintenance or management of the Property as of the Effective Date, including, any New Contracts.

"Title Commitment" means a current commitment for title insurance for an ALTA owner's policy on the Title Company's most current form issued by the Title Company in the State of California.

"Title Company" means Chicago Title Company; Attention: Chris Miller, e-mail: chris.miller@ctt.com.

(b)    Interpretation. When the context so requires in this Agreement, words of one gender include one or more other genders, singular words include the plural, and plural words include the singular. Use of the words "include" and "including" are intended as an introduction to illustrative matters and not as a limitation. When either party is granted permission to exercise its discretion in this Agreement, there shall be no requirement, unless the Agreement expressly states to the contrary, to exercise such discretion reasonably or in accordance with commercial standards and instead such discretion may be exercised in the sole, absolute and unilateral discretion of such party. References in this Agreement to "Sections" are to the numbered subdivisions of this Agreement, unless another document is specifically referenced. The word "party" when used in this Agreement means either Buyer or Seller unless another meaning is required by the context. The word "person" includes individuals, entities and governmental authorities. The word "governmental authority" is intended to be construed broadly and includes federal, state and local governmental entities, commissions, councils, instrumentalities, bodies, boards, departments and officers and individuals acting in any official capacity. When used in this Agreement, the word "laws" is intended to be construed broadly and includes all codes, statutes, rules, regulations, ordinances, pronouncements, case law, requirements, orders, directives, decisions, decrees, judgments and formal or informal guidance or interpretations of any court or governmental authority having jurisdiction over the Property and construction and operation of the Improvements thereon (including but not limited to all Environmental Laws, the Americans with Disabilities Act and any local Board of Fire Underwriters).

2.    Agreement to Purchase.

3

Buyer agrees to purchase the Property from Seller, and Seller agrees to sell the Property to Buyer, on the terms and subject to the conditions provided in this Agreement.

3.    Purchase Price.

(a)    Purchase Price. The purchase price for the Property shall be One Hundred and Two Million Dollars $102,000,000.00 (the "Purchase Price") and shall be due and payable by Buyer to Seller in cash at Closing (as defined below).

(b)    Earnest Money. Buyer agrees to deposit $1,000,000 as earnest money (the "Earnest Money") with the Title Company within two (2) Business Days after the Effective Date, receipt of which shall be acknowledged by the Title Company. The Earnest Money shall be held in an account with a federally-insured financial institution with offices in Orange County, California. Except as otherwise provided in the last paragraph of Section 7, Section 12(b), Section 15(b) or Section 15(c), if Buyer has not delivered the Due Diligence Termination Notice (as defined below) prior to the expiration of the Feasibility Period, the Earnest Money shall become non-refundable. The Earnest Money shall be applied as a credit to the Purchase Price at Closing. However, if Buyer elects to terminate this Agreement as permitted hereunder by timely delivering a Due Diligence Termination Notice to Seller, the Earnest Money shall be paid to Buyer following Seller's receipt of such Due Diligence Termination Notice from Buyer.  In the event of a termination of this Agreement by either Seller or Buyer for any other reason, the Earnest Money shall be delivered to the party hereto entitled to same pursuant to the terms hereof on or before the fifth Business Day following receipt by the Title Company and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies the Title Company that it disputes the right of the other party to receive the Earnest Money prior to the end of the fourth (4th) Business Day following receipt of termination. In the event of such a dispute, the Title Company may interplead the Earnest Money into a court of competent jurisdiction in the county in which the Earnest Money has been deposited. All attorneys' fees and costs and the Title Company's costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution. In the event Buyer fails to timely deliver the Earnest Money as provided in this Section, Seller may elect, in its sole and absolute discretion, and without any instruction from the Buyer, to terminate this Agreement and cancel any escrow opened in connection therewith.

(c)    Independent Contract Consideration. Buyer agrees that it will expend significant time and material sums of money in connection with negotiating and executing this Agreement, conducting its due diligence investigations, and preparing for the Closing, all in reliance on Seller's obligations under this Agreement. Further, Seller acknowledges that Buyer would not have entered into this Agreement without having the opportunity to perform such investigations and without having the right to terminate this Agreement in accordance with the provisions of Section 5(b) of this Agreement. Accordingly, separate consideration exists to support Seller's obligations hereunder notwithstanding Buyer's right to terminate this Agreement in accordance with the provisions of Section 5(b) of this Agreement. Without limitation upon the foregoing, $100.00 of the Earnest Money (the "Independent Consideration") shall in all events be deemed earned by Seller upon execution and delivery of this Agreement by Seller and Buyer and shall be immediately released by Title Company to Seller upon Title Company's receipt of the

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609AF00F4BA

initial Earnest Money. The Independent Consideration represents adequate bargained-for consideration for Seller's execution and delivery of this Agreement and Buyer's right to inspect the Property pursuant to the terms hereof. The Independent Consideration is in addition to and independent of any other consideration or payment provided for herein and is nonrefundable in all events, but shall be credited against the Purchase Price at the Closing.

4.   Escrow and Closing.

(a)   Escrow. Seller and Buyer shall promptly deliver a fully executed copy of this Agreement to Title Company. Seller and Buyer shall execute and deliver to Title Company any additional or supplementary instructions as may be necessary or convenient to implement the terms of this Agreement and close the transactions contemplated hereby, provided such instructions are consistent with and merely supplement this Agreement and shall not in any way modify, amend or supersede this Agreement. Such supplementary instructions, together with the escrow instructions set forth in this Agreement, as they may be amended from time to time by the parties, shall collectively be referred to as the "Escrow Instructions." The Escrow Instructions may be amended and supplemented by such standard terms and provisions as the Title Company, as escrow holder, may request the parties hereto to execute; provided, however, that the parties hereto and Title Company acknowledge and agree that in the event of a conflict between any provision of such standard terms and provisions supplied by the Title Company and the Escrow Instructions, the Escrow Instructions shall prevail.

(b)   Closing.   The closing of the transactions contemplated hereby (the "Closing") shall occur at the offices of the Title Company no later than fifteen (15) days after the expiration of the Feasibility Period (subject to extension as provided for in this Agreement, the "Closing Date").

(c)   Seller Closing Deliveries. At least one (1) Business Day prior to the Closing Date, Seller will deposit with the Title Company the following items (collectively, the "Seller Closing Documents"):

(i)   a grant deed (the "Deed"), in the form attached to this Agreement as Exhibit A, executed and acknowledged by Seller, conveying to Buyer the Land and the Improvements, which Deed shall be recorded by the Title Company in the official records of Orange County, California, on the Closing Date;

(ii)   a bill of sale ("Bill of Sale"), in the form attached to this Agreement as Exhibit B, executed by Seller;

(iii)   an Assignment and Assumption Agreement with respect to Service Contracts and other matters, in the form attached to this Agreement as Exhibit C (the "Assignment and Assumption Agreement"), executed by Seller;

(iv)   such documents as the Title Company may reasonably require to establish the authority of Seller to complete the transfer of the Property contemplated by this Agreement;

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

(v)    an affidavit, dated as of the Closing Date and executed by an appropriate representative of Seller under penalty of perjury, stating that Seller is not a person with respect to whom withholding is required under Section 1445 of the Internal Revenue Code of 1986, as amended (as well as any California state law equivalent form);

(vi)    a closing statement; and

(vii)    any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(d)    <u>Buyer Closing Deliveries</u>.    At least one (1) Business Day prior to the Closing Date, Buyer will deposit with the Title Company (i) the Purchase Price, net of credit for the Earnest Money and adjustments for prorations and other items charged or credited to Buyer in accordance with this Agreement, and (ii) the following documents (collectively, the "<u>Buyer Closing Documents</u>"):

(i)    such documents as the Title Company may require to complete the transfer of the Property contemplated by this Agreement to Buyer;

(ii)    an executed counterpart of the Assignment and Assumption Agreement;

(iii)    the closing statement; and

any and all other items contemplated by the terms of this Agreement or reasonably required by the Title Company.

(e)    <u>Return of Closing Deliveries</u>.    Documents and funds deposited in escrow under <u>Section 4(c)</u> or <u>4(d)</u> will be returned to the person who deposited them if Seller or Buyer terminates its obligation to complete the transfer of the Property contemplated by this Agreement under circumstances allowed by this Agreement.

(f)    <u>Deliveries Outside of Escrow</u>.    Promptly following the Closing (if not previously delivered to Buyer or located at the Property), Seller will deliver to Buyer, outside of the closing escrow, originals or, if originals are not in Seller's possession, copies of any Service Contracts and files related thereto in the possession of Seller.

(g)    <u>Deliveries Upon Close of Escrow</u>.    Upon the Closing, Title Company shall promptly undertake all of the following:

(i)    Cause the Deed, and any other documents which the parties hereto may direct, to be recorded in the Official Records in the order directed by the parties;

(ii)    Disburse from funds deposited by Buyer with Title Company towards payment of all items and costs (including, without limitation, the Purchase Price) chargeable to the account of Buyer pursuant hereto in payment of such items and costs;

(iii)    Issue the Title Policy to Buyer;

   (iv) Deduct all items chargeable to the account of Seller pursuant to Section 9. If, as the result of the net prorations and credits pursuant to Section 9, amounts are to be charged to the account of Seller, deduct the total amount of such charges from the Purchase Price (unless Seller elects to deposit additional funds for such items in Escrow); and if amounts are to be credited to the account of Seller, disburse such amounts to Seller, or in accordance with Seller's instructions, at the Closing; and

   (v) Disburse the Purchase Price (or balance thereof) to Seller, or as otherwise directed by Seller, promptly upon the Closing, in accordance with Seller's wire transfer instructions.

  5. <u>Delivery of Due Diligence Materials; Feasibility Period</u>.

   (a) <u>Due Diligence</u>. During the Feasibility Period and following at least one (1) Business Day's prior notice from Buyer, Seller agrees to allow Buyer, its authorized agents or representatives, at Buyer's expense, to inspect at the Property and make copies of any other documents and property records relating exclusively to the ownership, operation and maintenance of the Property, but only if and to the extent such documents and property records are in Seller's possession at the Property. In addition, commencing on the Effective Date and continuing until Closing (or earlier termination of this Agreement), Buyer shall have reasonable access to the Land at all reasonable times during normal business hours, for the purpose of conducting physical inspections and tests, including surveys and architectural, engineering, geotechnical and environmental inspections and tests, provided that (i) Buyer must give Seller 48 hours' prior telephone or written notice of any such inspection or test, and with respect to any intrusive inspection or test (i.e., core sampling), must obtain Seller's prior written consent (which consent shall not be unreasonably withheld or conditioned); (ii) prior to performing any inspection or test, Buyer must deliver a certificate of insurance to Seller evidencing that Buyer and its contractors, agents and representatives have in place comprehensive general liability insurance (with policy limits of at least $3,000,000) and workers' compensation insurance (with policy limits not less than statutory requirements) for its activities on the Land covering any accident arising in connection with the presence of Buyer, its contractors, agents and representatives on the Land, which insurance shall name Seller as an additional insured thereunder; and (iii) all such tests shall be conducted by Buyer in compliance with Buyer's responsibilities set forth in this Section 5. Buyer shall bear the cost of all such inspections or tests. Subject to the provisions of this Section 5, Buyer or Buyer's representatives may meet with any governmental authority for any good faith, reasonable purpose in connection with the transaction contemplated by this Agreement; provided, however, Buyer must contact Seller at least 24 hours in advance to inform Seller of Buyer's intended meeting and to allow Seller the reasonable opportunity to attend such meeting if Seller desires.

   (b) <u>Termination Right</u>. Notwithstanding anything to the contrary in this Agreement, Buyer may terminate this Agreement for any reason or no reason by giving written notice of termination to Seller and the Title Company (the "<u>Due Diligence Termination Notice</u>") on or before the expiration of the Feasibility Period. If Buyer does not timely give a Due Diligence Termination Notice, this Agreement shall continue in full force and effect, Buyer shall be deemed to have waived its right to terminate this Agreement pursuant to Section 8(c) and this Section 5(b), and Buyer shall be deemed to have acknowledged that it has received or had access to all

Information and conducted all inspections and tests of the Property that it considers necessary or desirable.

(c)  <u>Return of Reports</u>. If this Agreement terminates for any reason, Buyer shall promptly return and/or deliver to Seller all Information and copies thereof. Additionally, if this Agreement terminates for any reason other than Seller's default, then upon request by Seller Buyer shall deliver to Seller copies of all third-party reports, surveys, investigations and studies relating to the Property (collectively, the "<u>Reports</u>" and, individually, a "<u>Report</u>") prepared for Buyer in connection with its due diligence review of the Property. The Reports shall be delivered to Seller without any representation or warranty as to the completeness or accuracy of the Reports or any other matter relating thereto. Buyer's obligation to deliver the Information and the Reports to Seller shall survive the termination of this Agreement.

(d)  <u>Service Contracts</u>. On or prior to the expiration of the Feasibility Period, Buyer will advise Seller in writing of which Service Contracts it will assume and for which Service Contracts Buyer requests that Seller deliver a written termination notice at or prior to Closing, provided Seller shall have no obligation to deliver such a termination notice, and Buyer shall be obligated to assume, any Service Contracts which by their terms cannot be terminated at all, or which cannot be terminated without penalty or payment of a fee. Buyer shall be deemed to have elected to assume all Service Contracts if Buyer fails to specify in writing to Seller which, if any, Service Contracts Buyer wishes to assume and/or terminate prior to the expiration of the Feasibility Period. Buyer must assume the obligations arising from and after the Closing Date under the New Contracts and those Service Contracts (i) that Buyer has agreed to assume, or that Buyer is obligated to assume pursuant to this <u>Section 5(d)</u>, and (ii) for which a termination notice is delivered at or prior to Closing but for which termination is not effective until after Closing.

(e)  <u>Proprietary Information; Confidentiality</u>. Buyer acknowledges that the Information is proprietary and confidential and will be delivered to Buyer or made available for Buyer's review solely to assist Buyer in determining the feasibility and financing of purchasing the Property. Buyer shall not use the Information for any purpose other than as set forth in the preceding sentence. Buyer shall not disclose the Information to any person other than to those persons who are responsible for determining the feasibility of Buyer's acquisition of the Property or financing thereof and who have agreed to preserve the confidentiality of such information as required hereby (collectively, "<u>Permitted Outside Parties</u>"). Buyer shall not divulge the Information except in strict accordance with the confidentiality standards set forth in this <u>Section 5(e)</u>. In permitting Buyer to review the Information, Seller has not waived any privilege or claim of confidentiality with respect thereto, and no third-party benefits or relationships of any kind, either express or implied, have been offered, intended or created.

(f)  <u>No Representation or Warranty by Seller</u>. Buyer acknowledges that, except as expressly set forth in this Agreement, Seller has not made nor makes any warranty or representation regarding the truth, accuracy or completeness of the Information or the source(s) thereof. Buyer further acknowledges that some if not all of the Information was prepared by third parties other than Seller. Seller expressly disclaims any and all liability for representations or warranties, express or implied, statements of fact and other matters contained in such information, or for omissions from the information, or in any other written or oral communications transmitted or made available to Buyer. Buyer shall rely solely upon its own investigation with respect to the

8

Property, concerning all matters related to the design, financing, development, entitlement, construction, maintenance, management, or performance of the Property, including, without limitation, the Property's physical, environmental or economic condition, compliance or lack of compliance with any ordinance, order, permit or regulation or any other attribute or matter relating thereto. Seller has not undertaken any independent investigation as to the truth, accuracy, or completeness of the Information and is providing the Information or making the same available for Buyer's review solely as an accommodation to Buyer.

(g)　　Buyer's Responsibilities. In conducting any inspections, investigations, or tests of the Property and/or the Information, Buyer and its agents and representatives shall: (i) not unreasonably interfere with the operation and maintenance of the Property, (ii) not damage any part of the Property or any personal property owned or held by any tenant or any third party; (iii) not injure or otherwise cause bodily harm to Seller, or its respective agents, guests, invitees, contractors, or employees; (iv) comply with all applicable laws; (v) promptly pay when due the costs of all tests, investigations and examinations done with regard to the Property; (vi) not permit any liens to attach to the Property by reason of the exercise of its rights hereunder, (vii) repair any damage to the Property resulting directly or indirectly from any such inspection or tests; and (viii) not reveal or disclose prior to Closing any Information to anyone other than the Permitted Outside Parties, in accordance with the confidentiality standards set forth in Section 5(e), or except as may be otherwise required by law.

(h)　　Buyer's Agreement to Indemnify. Buyer indemnifies and holds Seller harmless from and against any and all liens, claims, causes of action, damages, liabilities, and expenses (including reasonable attorneys' fees) arising out of Buyer's inspections or tests of the Property or any violation of the provisions of Section 5(a), Section 5(e) or Section 5(g); provided, however, the indemnity shall not apply to (i) a diminution in value of the Property caused solely by the disclosure to Buyer, Seller, or Permitted Outside Parties of Information regarding the discovery of any pre-existing Hazardous Materials at the Property; (ii) any release on or about the Property of any pre-existing Hazardous Materials at the Property, except and to the extent such release was contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties; or (iii) any conditions on or about the Property in existence as of the Effective Date except and to the extent contributed to or exacerbated by the negligence of Buyer or its Permitted Outside Parties. Buyer's obligations under this Section 5(h) shall survive the termination of this Agreement and shall survive the Closing.

6.　　Seller's Conditions.

Seller's obligation to sell the Property is conditioned on satisfaction or waiver in writing by Seller of each of the following conditions precedent:

(a)　　all representations of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and on and as of the Closing (as if re-made on and as of the Closing);

(b)　　Buyer shall have timely (i) executed, acknowledged (where required) and delivered to the Title Company all documents, instruments and agreements described in Section 4(d), and (ii) delivered to the Title Company, in immediately available funds and lawful

9

monies of the United States of America, all funds required by Section 4(d) including, but not limited to, the balance of the Purchase Price in accordance with Section 4(d); and

        (c)    as of the Closing, Buyer shall have materially performed all of its other obligations hereunder.

If any of the conditions in this <u>Section 6</u> are not satisfied as of the Closing Date (as may be extended hereunder), Seller may (1) elect to terminate this Agreement (and the Earnest Money shall be returned to the party entitled thereto), and the parties shall have no obligations to each other except those that survive the termination of the Agreement; or (2) waive such condition and proceed to Closing.

      7.    <u>Buyer's Conditions</u>.

Buyer's obligation to purchase the Property is conditioned on satisfaction or waiver in writing by Buyer of the following conditions:

        (a)    all representations of Seller contained in this Agreement are true and correct in all material respects at the time of the Closing;

        (b)    the Title Company shall have issued at the Closing, or be unconditionally committed at the Closing to issue, to Buyer an ALTA owner's title policy (the "Title Policy"), on Title Company's standard form issued in the State of California, showing title to the Property vested in Buyer, subject only to the Permitted Exceptions; and

        (c)    as of the Closing, Seller shall have materially performed all of its obligations hereunder.

If any of the conditions in this <u>Section 7</u> are not satisfied as of the Closing Date (as may be extended hereunder), Buyer may (1) elect to terminate to terminate this Agreement (and the Earnest Money shall be returned to the party entitled thereto), and the parties shall have no obligations to each other except those that survive the termination of the Agreement; or (2) waive such condition and proceed to Closing.

      8.    <u>Title And Survey</u>.

        (a)    <u>Title Report</u>.  Within five (5) Business Days after the Effective Date, Title Company shall deliver to Buyer (i) a current commitment for title insurance for a standard ALTA owner's policy on the Title Company's most current form (the "<u>Commitment</u>") issued by the Title Company, and (ii) copies of (or hyperlinks to copies of) all documents of record referred to in the Commitment as exceptions to title to the Land ("<u>Title Documents</u>").

        (b)    <u>New or Updated Survey</u>.  Within ten (10) calendar days after the Effective Date, to the extent in Seller's possession, Seller shall deliver to Buyer Seller's latest survey of the Property (the "<u>Survey</u>").  Buyer may elect to obtain a new or updated survey (the "<u>Updated Survey</u>") at its sole cost and expense; provided, however, that in no event shall the issuance and/or receipt of such Updated Survey be a condition precedent to, or delay, the Closing.

(c)    Title Review. During the Feasibility Period, Buyer shall review title to the Land as disclosed by the Commitment and any Survey. All matters shown in the Commitment, the Title Documents and the Survey (if any) that are not objected to by Buyer by delivery of written notice thereof ("Buyer's Title Objection Notice") to Seller on or before 4:00 p.m. Pacific time on the date that is seven (7) days prior to the expiration of the Feasibility Period (the "Title Review Period") shall be conclusively deemed to be accepted by Buyer. If Buyer timely delivers Buyer's Title Objection Notice to Seller prior to the expiration of the Title Review Period specifying Buyer's objection to any title exception pertaining to the Land shown in the Commitment, the Title Documents or the Survey (if any) (each a "Title Objection" and collectively the "Title Objections"), Seller may, but shall not be obligated to, eliminate or cure at Seller's sole cost (by title endorsement from the Title Company or otherwise), some or all of such Title Objections; provided, however, if Seller is able and willing to eliminate or cure some or all of such Title Objections, Seller shall notify Buyer in writing within two (2) Business Days after the expiration of the Title Review Period ("Seller's Notice Period") of those Title Objections Seller intends to eliminate or cure (said notice hereinafter called "Seller's Title Notice") and in which case the elimination or curing by Seller of the Title Objections specified by Seller for cure or elimination in Seller's Title Notice shall be completed on or before the Closing Date. If Seller does not deliver Seller's Title Notice to Buyer within Seller's Notice Period, Buyer is deemed to be notified that Seller is unable or unwilling to eliminate or cure the Title Objections. If Seller (i) does not timely deliver Seller's Title Notice or (ii) notifies or is deemed to have notified Buyer that Seller is unable or unwilling to cure any particular Title Objection, Buyer shall be deemed to have waived those Title Objections which Seller is unable or unwilling to eliminate or cure unless on or before the expiration of the Feasibility Period, Buyer delivers to Seller and Title Company Buyer's Due Diligence Termination Notice terminating this Agreement pursuant to Section 5(b). Notwithstanding anything herein to the contrary, if Buyer's right to terminate this Agreement pursuant to the foregoing provisions of this Section 8(c) has not expired prior thereto, it shall expire upon expiration of the Feasibility Period.

(d)    Amended Commitment. If at any time prior to Closing, the Title Company gives Buyer written notice of a new title exception or exceptions not reflected in any of the initial Commitment, the Survey, or the Updated Survey (and not caused or consented to by Buyer) (a "New Title Defect"), then, within two (2) Business Days after the giving of such notice, Buyer may submit to Seller a revised Buyer's Title Objection Notice relating only to such new exceptions. Within two (2) Business Days after receipt of the revised Buyer's Title Objection Notice, Seller shall notify Buyer pursuant to a revised Seller's Title Notice of Seller's election either to cure or not to cure a New Title Defect listed in the revised Buyer's Title Objection Notice. Seller's failure to timely respond to a revised Buyer's Title Objection Notice shall be deemed a decision by Seller not to cure the New Title Defects listed in the revised Buyer's Title Objection Notice. Within three (3) days after Seller elects (or is deemed to have elected) not to cure a New Title Defect listed in a revised Buyer's Title Objection Notice, Buyer may, by written notice to Seller, elect as its sole remedy to either (i) waive the uncured New Title Defects or (ii) terminate this Agreement in which event Buyer shall receive a return of the Earnest Money. The Closing Date shall be extended if and to the minimum extent necessary to accommodate the time periods in this Section 8(d).

9.    Closing Costs and Prorations.

(a)   <u>Closing Costs</u>.  Buyer will pay (i) [reserved]; (ii) all recording costs, including the recording cost for the recordation of the Deed; (iii) the cost of any Updated Survey or any other updated or updates to the Survey, if Buyer elects to obtain one; (iii) all financing costs, including documentary stamps or tax on any note or mortgage procured by Buyer; (iv) all other surveying costs and all costs associated with any Feasibility Period inspections; (v) one-half of any escrow fee charged by the Title Company; (vi) all premiums for any costs of the Title Policy attributable to ALTA extended coverage and any endorsements desired by Buyer and the cost of any lender policies and endorsements thereto; and (vii) any inspection fee charged by the Title Company.  Buyer and Seller each will pay its own attorneys' fees, subject to <u>Section 17(b)</u>.  Seller will pay for (i) the premium for standard coverage owner's policy of title insurance; (ii) one-half (1/2) of any escrow fee charged by the Title Company; and (iii) all State and County transfer taxes. Other costs will be paid by Seller or Buyer, as applicable, as specified by other provisions of this Agreement or, if no provision is made in this Agreement, in accordance with local custom in Orange County, California.

(b)   <u>Prorations</u>.  Seller and Buyer will prorate all expenses of operation of the Property, if any (including utilities, personal property taxes and real property taxes and property assessments taking into account maximum discounts), except for insurance premiums, as of midnight on the day before the Closing.  Amounts allocable to the Closing Date will be for the account of Buyer.  If any expenses cannot be determined finally as of the Closing Date, such expense will be prorated on the best available information or, with respect to real property taxes on the latest available tax bill from the Orange County tax assessor.  Adjustments to the prorations (other than the tax proration) will be made from time to time within 30 days after the Closing Date to take account of final information as to expenses estimated as of the Closing Date or to adjust expenses that were not included in the prorations done at the Closing, and Buyer or Seller, as applicable, will pay the other on demand such amounts as may be appropriate based on such adjustments, together with interest at 10% per annum from the date of demand if such amount remains unpaid more than ten days after demand.  Any reproration of expenses (other than taxes) must be completed within thirty (30) days after the Closing Date and, subject to <u>Section 9(c)</u>, and except for real property taxes and assessments, neither Buyer nor Seller will be entitled to request a payment on account of reprorations after such date.  The determination of real property taxes on the Closing Date under this <u>Section 9(b)</u> shall be conclusively binding upon Seller and Buyer without the requirement or burden of any post-Closing adjustment, "true-up" or reconciliation once the actual tax assessments are known.

10.   <u>Representations and Warranties</u>.

(a)   <u>Seller's Representations and Warranties</u>.  In order to induce Buyer to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement, Seller represents and warrants to Buyer that, as of the date of this Agreement:

(i)   Seller has duly been organized and is validly existing under the laws of the United States of America.  Seller has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement.  Seller has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement, and the completion of the transfer of the Property contemplated by this Agreement.

12

(ii)    This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding, and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity.

(iii)    The execution and delivery of this Agreement by Seller and the performance by Seller of its obligations under this Agreement and the completion of the transfer of the Property contemplated by this Agreement will not result in (1) a material breach of or a default under, any contract, agreement, commitment or other document or instrument to which Seller is party or by which Seller or the Property is bound (except the Service Contracts, Guaranties or other Intangibles, as to which Seller makes no representation or warranty); or (2) a material violation of any law, ordinance, regulation or rule of any governmental authority applicable to Seller or any judgment, order or decree of any court or governmental authority that is binding on Seller.

(iv)    Seller is not required to obtain any material consent, approval, or authorization from, or to make any material filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Seller of its obligations under this Agreement or the completion of the transfer of the Property contemplated by this Agreement.

(v)    There is no action, suit, proceeding, or claim against Seller or affecting the Property, or, to the best of Seller's knowledge, threatened in writing against the Seller or Property, that would prevent the performance by Seller of its obligations under this Agreement or the completion of the transfer of the Property contemplated by this Agreement.

(vi)    To Seller's actual knowledge, during the twelve (12) month period ending on the Effective Date, Seller has not received written notice from any governmental entity of any material violation on the Property of, or any non-conformity of the Property with, any law, rule or regulation (not subsequently cured or corrected).

As used in this Section 10(a), the phrase "to Seller's actual knowledge" and similar expressions means the actual knowledge of Jason Miller, without inquiry of any sort and without imputation of knowledge of others, and without any personal liability under or in connection with this Agreement.

Notwithstanding anything to the contrary in this Agreement, Seller shall have no liability, and Buyer shall make no claim against Seller, for (and Buyer shall be deemed to have waived any failure of a condition hereunder by reason of) a failure of any condition or a breach of any representation or warranty, covenant or other obligation of Seller under this Agreement or any closing document executed by Seller if (a) the failure or breach in question constitutes or results from a condition, state of facts or other matter that was actually known to Buyer prior to the expiration of the Feasibility Period; or (b) the failure or breach in question constitutes or results from a condition, state of facts or other matter that was actually known to Buyer prior to Closing and Buyer proceeds with the Closing.

(b)    Buyer's Representations and Warranties.  In order to induce Seller to enter into this Agreement and to complete the transfer of the Property contemplated by this Agreement,

13

Buyer represents and warrants to Seller that, as of the date of this Agreement and as of the date of Closing:

(i)     Buyer has been duly incorporated and is validly existing under the laws of the State of California. Buyer has the power to enter into this Agreement, to perform its obligations under this Agreement and to complete the transfer of the Property contemplated by this Agreement. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement and the completion of the purchase of the Property contemplated by this Agreement.

(ii)    This Agreement has been duly executed and delivered by Buyer and constitutes a valid, binding and enforceable obligation of Buyer, subject to bankruptcy and other debtor relief laws and principles of equity, and excluding the jury trial waiver set forth herein.

(iii)   The execution and delivery of this Agreement by Buyer, the performance by Buyer of its obligations under this Agreement and the completion of the purchase of the Property contemplated by this Agreement will not result in (1) a breach of, or a default under, any contract, agreement, commitment or other document or instrument to which Buyer is party or by which Buyer is bound; or (2) a violation of any law, ordinance, regulation or rule of any governmental authority applicable to Buyer or any judgment, order or decree of any court or governmental authority that is binding on Buyer.

(iv)    Except for consents, approvals, authorizations and filings already completed, Buyer is not required to obtain any consent, approval or authorization from, or to make any filing with, any person (including any governmental authority) in connection with, or as a condition to, the execution and delivery of this Agreement, the performance by Buyer of its obligations under this Agreement or the completion of the purchase of the Property contemplated by this Agreement.

(v)     Neither Buyer nor any of its affiliates or constituents nor any brokers or other agents of same, have engaged in any dealings or transactions, directly or indirectly, (i) with any Prohibited Person (defined below), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person, (ii) in contravention of any U.S., international or other money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. §1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, (iii) in contravention of Executive Order no. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), as may be amended or supplemented from time to time ("Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency,

U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time, or (iv) any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (a) the Foreign Corrupt Practices Act, (b) the U.S. mail and wire fraud statutes, (c) the Travel Act, (d) any similar or successor statutes or (e) any regulations promulgated under the foregoing statutes. Neither Buyer nor any of its Affiliates or constituents nor any brokers or other agents of same, (x) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (y) are a person described in section 1 of the Anti-Terrorism Order, and neither Buyer nor any of its affiliates have engaged in any dealings or transactions, or otherwise been associated with any such person. If at any time this representation becomes false then it shall be considered a default under this Agreement and Seller shall have the right to exercise all of the remedies set forth in this Agreement in the event of a default or to terminate this Agreement immediately. As used herein, the following terms shall have the following meanings: (a) "Prohibited Person" means any Person that is now or shall be at any time until Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by Office of Foreign Assets Control, Department of the Treasury ("OFAC") with respect to Specially Designated Nationals and Blocked Persons) or otherwise; and (b) "U.S. Person" means a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories.

(vi)    Buyer is not an employee benefit plan as defined in Section 3(3) of ERISA. Buyer is not acquiring the Property with assets that constitute "plan assets" within the meaning of the plan asset regulations promulgated by the U.S. Department of Labor at 29 C.F.R. 2510.3-101 et seq., as amended or modified from time to time.

(vii)   No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under federal or state bankruptcy laws in pending against or contemplated by Buyer or its general partner(s) or controlling shareholders or members.

(c)     Disclaimers.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN SECTION 10(a) AND ANY SELLER CLOSING DOCUMENT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PROPERTY OR ITS CONDITION OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY AND BUYER ACCEPTS SUCH DISCLAIMERS. THE DISCLAIMERS IN THIS SECTION 12(c) SPECIFICALLY EXTEND

15

TO (1) MATTERS RELATING TO HAZARDOUS MATERIALS AND COMPLIANCE WITH
ENVIRONMENTAL LAWS, (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE,
SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND
RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS
REGARDING THE WITHDRAWAL OF WATER, EARTHQUAKE FAULTS, AND
MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR
SPECIAL FLOOD HAZARDS, (3) STORMWATER DETENTION, RETENTION,
DISCHARGE OR DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF
UNSTABLE SOILS, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES,
AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION
AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND
PROFIT POTENTIAL OF THE PROPERTY, (7) DESIGN, CONSTRUCTION, QUALITY,
SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE
PROPERTY AND (8) COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING
BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT
OF 1990 AND THE FAIR HOUSING AMENDMENTS ACT OF 1988). BUYER REPRESENTS
AND WARRANTS TO SELLER AND ITS RELATED ENTITIES THAT BUYER IS A
KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE.
BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND
WARRANTIES MADE BY SELLER IN SECTION 10(a) AND ANY SELLER CLOSING
DOCUMENT, BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER
DIRECTLY OR INDIRECTLY, ANY STATEMENT OF SELLER OR ANY OF ITS RELATED
ENTITIES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE OR OTHER
PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER OR ANY OF ITS
RELATED ENTITIES. BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL
CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF
THE PROPERTY AND ALL MAILERS BEARING UPON THE PROPERTY OR THE
DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL
CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER
DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS,
HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS
AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO
PROTECT ITS INTERESTS AND DETERMINE THE SUITABILITY OF THE PROPERTY
FOR BUYER'S INTENDED USE.  EXCEPT FOR THE REPRESENTATIONS AND
WARRANTIES IN SECTION 10(a) AND ANY SELLER CLOSING DOCUMENT, BUYER IS
ACQUIRING THE PROPERTY "AS IS" AND "WHERE IS" AND SUBJECT TO ALL
FAULTS, DEFECTS OR OTHER ADVERSE MATTERS, WHETHER PATENT OR LATENT.
UPON CLOSING, BUYER WILL ACCEPT THE PROPERTY SUBJECT TO BOTH PATENT
AND LATENT ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR
ENVIRONMENTAL CONDITIONS OR DEFECTS THAT MAY THEN EXIST, WHETHER
OR NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY
BUYER. BUYER SPECIFICALLY WAIVES AND RELEASES (1) ALL WARRANTIES,
EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF
HABITABILITY, MERCHANTABILITY, WORKMANLIKE CONSTRUCTION AND
FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY SELLER
BUT EXCLUDING THE REPRESENTATIONS  AND WARRANTIES IN SECTION 10(a)

16

AND ANY SELLER CLOSING DOCUMENTS) WITH RESPECT TO THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AND (2) EXCEPT FOR ANY BREACH BY SELLER UNDER THIS AGREEMENT OR ANY SELLER CLOSING DOCUMENT, ALL RIGHTS, REMEDIES, RECOURSE OR OTHER BASIS FOR RECOVERY (INCLUDING ANY RIGHTS, REMEDIES, RECOURSE OR BASIS FOR RECOVERY BASED ON NEGLIGENCE OR STRICT LIABILITY) THAT BUYER WOULD OTHERWISE HAVE AGAINST SELLER OR ANY OF ITS RELATED ENTITIES, ANY PERSON WHO HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST IN SELLER OR ANY RELATED ENTITY AND THE RESPECTIVE MEMBERS, PARTNERS, OFFICERS, DIRECTORS, TRUSTEES, AGENTS AND EMPLOYEES OF EACH SUCH PERSON IN RESPECT OF THE PROPERTY OR THE DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY, PHYSICAL CONDITION, COMPLIANCE WITH LAWS, SOIL CONDITIONS, STORMWATER DETENTION, RETENTION OR DISCHARGE, DRAINAGE, GEOLOGICAL CONDITIONS, HAZARDOUS MATERIALS, ZONING, CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS.  BUYER ACKNOWLEDGES AND AGREES THAT: (i) THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c) ARE AN INTEGRAL PART OF THIS AGREEMENT, (ii) SELLER WAS MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT AND SELL THE PROPERTY TO BUYER IN MATERIAL RELIANCE UPON SUCH DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c), (iii) SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT, WITHOUT THE DISCLAIMERS, WAIVERS, RELEASES AND OTHER PROVISIONS SET FORTH IN THIS SECTION 10(c).  THE PROVISIONS OF THIS SECTION 10(c) AND THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH HEREIN SHALL EXPRESSLY INCLUDE AND BE FOR THE BENEFIT OF ALL RELATED ENTITIES AND ALL RELATED ENTITIES ARE EXPRESSLY THIRD-PARTY BENEFICIARIES OF THIS SECTION 10(c).

(d)    Release.  In furtherance of the "AS IS, WHERE IS" nature of the sale, and except for Seller's representations and warranties under Section 10(a), Buyer shall rely solely upon Buyer's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition.  Except with respect to Seller's representations and warranties under Section 10(a) or in the Seller Closing Documents, Buyer and anyone claiming by, through or under Buyer hereby waives its right to recover from and fully and irrevocably releases Seller and the Seller Related Entities from any and all Claims that it may now have or hereafter acquire against any of the Seller Related Entities arising from or related to any construction defects, errors, omissions or other conditions, latent or otherwise, including environmental matters, affecting the Property, or any portion thereof.  This release includes Claims or which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Seller.  From and after the Close of Escrow, in connection with the above release, Buyer specifically waives the provision of California Civil Code Section 1542, which provides as follows:

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that from and after the Close of Escrow, Buyer nevertheless hereby intends to release, discharge and acquit Seller from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.

Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this <u>Section 10(d)</u>. Buyer has initialed this <u>Section 10(d)</u> to further indicate its awareness and acceptance of each and every provision hereof. This <u>Section 10(d)</u> shall survive any termination of this Agreement and the Closing.

BUYER'S INITIALS: _____

(e)     <u>Survival</u>. The representations and warranties in <u>Section 10(a)</u> and <u>Section 10(b)</u> will survive Closing, but only for a period (the "<u>Survival Period</u>") of three (3) months, and no claim shall be allowed on any such representation or warranty unless notice of the claim and a detailed statement of the basis for the claim is delivered by the claimant to the other party within such three-month Survival Period. Nothing in this <u>Section 10(e)</u> limits the disclaimers, waivers, releases and other provisions in <u>Section 10(c)</u>, all of which will survive Closing without limit as to time.

11.     <u>Specific Rights and Obligations</u>.

(a)     <u>Maintenance of Insurance</u>. Seller agrees that it will maintain all insurance in effect as of the date of this Agreement with respect to the Property (or, if such insurance is cancelled or expires, comparable insurance to the extent it is available on commercially reasonable terms) until the earlier of the Closing or the termination by Buyer or Seller of its obligation to complete the transfer of the Property contemplated by this Agreement.

(b)     <u>Conduct of Business</u>. Until the earlier of the Closing Date or the termination by Buyer or Seller of its obligation to complete the transfer of the Property, Seller will carry on its business with respect to maintaining and operating the Property in a manner that is

consistent with Seller's past practices subject to changes in asset management and leasing parameters as Seller considers desirable or necessary to meet market conditions.

       (c)   <u>Leasing</u>. Between the Effective Date and expiration of the Feasibility Period, Seller will not enter into any new leases affecting the Property ("<u>New Leases</u>").

     12.   <u>Remedies</u>.

       (a)   <u>SELLER'S REMEDIES</u>. IF BUYER FAILS TO PURCHASE THE PROPERTY IN VIOLATION OF THIS AGREEMENT, THEN SELLER, AS ITS SOLE AND EXCLUSIVE REMEDY, MAY TERMINATE ITS OBLIGATION TO COMPLETE THE TRANSFER OF THE PROPERTY AND, UPON SO DOING, WILL BE ENTITLED TO RECEIVE THE EARNEST MONEY AS LIQUIDATED DAMAGES. SELLER WAIVES ALL REMEDIES FOR BUYER'S FAILURE TO COMPLETE THE TRANSFER OF THE PROPERTY, EXCEPT THOSE SPECIFICALLY PROVIDED FOR IN THIS <u>SECTION 12(a)</u>. SELLER AND BUYER ACKNOWLEDGE THAT SELLER'S DAMAGE WOULD BE DIFFICULT OR IMPOSSIBLE TO ASCERTAIN IN THE EVENT OF BUYER'S DEFAULT IN ITS OBLIGATION TO PURCHASE THE PROPERTY AND THAT THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS <u>SECTION 12(A)</u> ARE A REASONABLE ESTIMATE OF SELLER'S DAMAGES. SELLER AND BUYER ACKNOWLEDGE THAT THE AMOUNT OF THE LIQUIDATED DAMAGES HAS BEEN SET TAKING INTO ACCOUNT VARIOUS FACTORS, INCLUDING THE POTENTIAL FOR CHANGE IN VALUE OF THE PROPERTY. THE REMEDIES PROVIDED IN THIS <u>SECTION 12(A)</u> ARE EXCLUSIVE, PROVIDED, HOWEVER, THAT NOTHING IN THIS <u>SECTION 12(A)</u> LIMITS SELLER'S REMEDIES FOR ANY BREACH BY BUYER OF ANY REPRESENTATION, WARRANTY, OBLIGATION, UNDERTAKING, OR INDEMNITY THAT SURVIVES THE TERMINATION OF THIS AGREEMENT, AS EXPRESSLY SET FORTH IN THIS AGREEMENT. IF CLOSING IS CONSUMMATED, THEN SELLER SHALL HAVE ALL REMEDIES AVAILABLE AT LAW OR IN EQUITY IF BUYER FAILS TO PERFORM ANY OBLIGATION OF BUYER UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE), BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677 (AND ANY CORRESPONDING PROVISIONS OF THE LAWS OF OTHER JURISDICTIONS, IF APPLICABLE). THE PARTIES HAVE SET FORTH THEIR INITIALS BELOW TO INDICATE THEIR AGREEMENT WITH THE LIQUIDATED DAMAGES PROVISION CONTAINED IN THIS SECTION.

      BUYER _____    SELLER _____

       (b)   <u>Buyer's Remedies</u>. If the Closing does not occur solely as a result of Seller's failure to materially perform any of its obligations under this Agreement, such failure shall constitute a Seller default, and if such default is not cured within fifteen (15) days after written demand for performance delivered to Seller by Buyer, then Buyer may either (i) terminate its obligation to complete its purchase of the Property, in which event Buyer shall be entitled to the

Earnest Money; or (ii) enforce specific performance of Seller's obligation; provided, however, that the remedy of specific performance shall only be available if (i) Seller has willfully and intentionally breached its obligation to close under this Agreement; (ii) Buyer has deposited with the Title Company, prior to the Closing Date, all documents and funds required to be deposited by Buyer under this Agreement in order to close the transactions contemplated under this Agreement; and (iii) any suit for specific performance is filed and served by Buyer no later than thirty (30) days after the Closing Date (and if Buyer fails to commence and serve a suit for specific performance within such thirty (30)-day period, Buyer will be deemed to have irrevocably waived its right to bring suit for specific performance at any later date). The remedies provided in this Section 12(b) are exclusive, and Buyer expressly waives all other remedies, claims and causes of action (including any right to obtain lost profits or actual, consequential, special or any other damages from Seller) for Seller's failure in performance prior to Closing or for any inaccuracy of Seller's representations and warranties that is discovered by Buyer prior to Closing.

(c)    Limitation on Liability. Notwithstanding anything to the contrary contained elsewhere herein, no claim for any breach by Seller of any representation, warranty, covenant, indemnity, or obligation of Seller under this Agreement, or under any document, instrument or agreement delivered by Seller at the Closing (including any Seller Closing Documents), which is asserted by Buyer after the Closing, shall be actionable or payable unless each of the following conditions is satisfied: (i) the breach in question results from or is based on a condition, state of facts or other matter which was not known to Buyer prior to Closing; (ii) the valid claims for all such breaches, if any, collectively aggregate more than One Hundred Thousand Dollars ($100,000), in which event the amount of claims in excess of such amount shall be actionable; and (iii) written notice containing a description of the specific nature of such breach shall have been given by Buyer to Seller prior to the expiration of the Survival Period, and an action shall have been commenced by Buyer against Seller within thirty (30) days after the termination of the Survival Period. Buyer agrees to first seek recovery under any insurance policies, the Title Policy and the Service Contracts prior to seeking recovery from Seller, and Seller shall not be liable to Buyer if Buyer's claim is satisfied from such insurance policies, Title Policies or Service Contracts. In addition, and notwithstanding anything to the contrary contained in this Agreement or any document or certificate executed in connection with this Agreement (including the Seller Closing Documents), the aggregate liability of Seller and Related Entities arising directly or indirectly pursuant to or in connection with the representations and warranties (whether express or implied), covenants, indemnities and other obligations of Seller under this Agreement and all documents and certificates executed in connection with this Agreement (including the Seller Closing Documents) shall be limited to $250,000 (the "Cap"), regardless of whether any such liability arises from the actual or alleged negligent, willful or intentional act or omission of Seller or any Related Entity. The provisions of this Section 12(c) shall survive Closing.

13.    Brokerage.

No brokers were involved. The Seller shall pay a real estate commission pursuant to separate agreement to Seller's Broker. The commission shall be paid through escrow, at the Closing, and only if the transaction contemplated hereunder closes. Each party hereby represents and warrants to the other that, other than the brokers identified above, it has not dealt with any broker or finder with respect to the transaction contemplated hereby. Subject to the preceding sentence, Seller and Buyer each agrees to indemnify and defend the other and hold the other

harmless against any claim for a commission, finder's fee or similar compensation asserted by any person retained by or claiming through the indemnifying party or its affiliates in connection with the transfer of the Property or the execution of this Agreement, and all related loss, damage, liability, obligation, claim, suit, cause of action, judgment, settlement, penalty, fine or cost or expense (including fees and disbursements of attorneys and other professionals and court costs). The provisions of this <u>Section 13</u> shall survive the Closing and any termination of this Agreement.

14.  <u>Possession.</u>

Seller will deliver possession of the Property to Buyer at the time of Closing, subject to the Permitted Exceptions.

15.  <u>Casualty and Condemnation.</u>

(a)  <u>Notice of Casualty or Condemnation.</u>  Seller will notify Buyer within 10 days after receiving notice of, or otherwise becoming aware of, (1) any Casualty Loss (as defined below) or (2) the commencement of any proceedings for the taking by eminent domain of all or any part of the Property.

(b)  <u>Casualty Losses.</u>  If, prior to Closing, the Property is damaged by fire, windstorm, rioting or other civil disturbance, acts of war, earthquake, or other casualty (a "<u>Casualty Loss</u>") and the cost to repair the related damage is more than $5,000,000 (a "<u>Material Casualty Loss</u>"), then Buyer, at its option, may terminate its obligation to complete the transfer of the Property contemplated by this Agreement upon notice to Seller of Buyer's intent to terminate within five days after receiving notice from Seller of such Casualty Loss, in which case the Earnest Money will be returned to Buyer.  If Buyer elects to complete the transfer of the Property notwithstanding a Material Casualty Loss, then Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected insurance proceeds and Seller will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.  All amounts payable under this <u>Section 15(b)</u> shall be less the proceeds of business interruption insurance allocable to the period through the Closing Date, amounts expended by Seller to stabilize or repair the Property and costs incurred by Seller in making proof of loss or settling claims with insurers.  If the Casualty Loss is not a Material Casualty Loss, then Buyer shall not have the right to terminate this Agreement, and Seller will deliver to Buyer at Closing, through the closing escrow, all insurance proceeds previously received by Seller, together with an assignment of Seller's rights with respect to all uncollected insurance proceeds, and Seller, at no cost or expense to Seller, will cooperate with Buyer after Closing in making claim for, and collecting, all available insurance proceeds.

(c)  <u>Condemnation.</u>  If, prior to Closing, all or a "material part" of the Property is taken by eminent domain or any proceedings for the taking by eminent domain of all or a material part of the Property is commenced or Seller and the condemning authority enter into discussions regarding Seller's delivery of a deed in lieu thereof, then Buyer, at its option within five days after receiving notice thereof from Seller, may terminate its obligation to complete the transfer of the Property in which case the Earnest Money will be returned to Buyer. If Buyer elects to complete the transfer of the Property notwithstanding a taking by eminent domain or proceeding therefore or deed in lieu thereof, Seller will deliver to Buyer at Closing, through the closing escrow,

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A560F4BA

all condemnation proceeds previously received by Seller and an assignment of Seller's rights with respect to all uncollected condemnation proceeds (in either case, net of proceeds allocable to loss of use of the Property for the period through the Closing Date and costs incurred by Seller in connection with such proceedings) and such documents as Buyer may reasonably request to substitute itself for Seller in any pending eminent domain proceedings.  For purposes of this Section 15(c), a "material part of the Property" shall mean the loss of any material means of access or any other portion of the Property that will result in a loss of more than 10,000 square feet of space within the Improvements or cost more than $5,000,000 to repair.

16.    Consequences of Termination.

If Buyer or Seller terminates its obligation to complete the transfer of the Property under circumstances permitted by this Agreement, neither Buyer nor Seller will have any further liability or obligation under this Agreement, except indemnity provisions and obligations under Section 5(h), Section 12 (if applicable) and Section 13 and any other term that expressly survives the termination of this Agreement.  Nothing in this Section 16 is intended to limit the obligations of the Title Company or the provisions of this Agreement dealing with the disposition of funds or documents held in escrow following termination of the obligations of Buyer or Seller. If Buyer or Seller terminates its obligation to complete the transfer of the Property, Buyer will deliver the Information to Seller.  Return of materials as required by this Section 16 will not limit Buyer's obligations under Section 5(h).

17.    Miscellaneous.

(a)    Survival.  Except as specifically provided for in Section 9(b), Section 10(e) and Section 12(c), all disclaimers, waivers, releases, covenants, undertakings and obligations under this Agreement and all representations and warranties contained in this Agreement will survive the Closing and will not be merged into the Deed or other documents delivered pursuant to this Agreement.

(b)    Attorneys' Fees.  If litigation is commenced by Buyer or Seller against the other party in connection with this Agreement or the Property, the party prevailing in the litigation will be entitled to collect from the other party the expense (including reasonable fees, costs and disbursements of attorneys, experts and other professionals and court costs) incurred in connection with the litigation, both prior to and during any appellate proceedings, said agreement to survive Closing and any termination of this Agreement.

(c)    Notices.  Any notice or other communication to any party given under this Agreement will be effective only if in writing delivered to whichever of the following addresses is applicable:

| If to Seller: | 520 Newport Center Dr Ste 480, Newport Beach, California, 92660 Attention: Jason Miller Electronic Mail: jason@continuumanalytics.com |
| --- | --- |

| With a copy to: | Buchalter PC<br>18400 Von Karman Avenue, Suite 800<br>Irvine, California 92612<br>Attention: Jason Brooks<br>Electronic Mail: jbrooks@buchalter.com |
|---|---|
| If to Buyer: | 731 Clover Hill Drive<br>Cookeville, TN 38501<br>Attention: John Anderson<br>Electronic Mail: jsilas77@icloud.com |
| If to Title Company: | Chicago Title Company<br>Attention: Chris Miller<br>Electronic Mail: chris.miller@ctt.com |

Any notice or other communication will be deemed received only upon delivery to the address provided for in this <u>Section 17(c)</u> or rejection of delivery at such address. Notice may be given by (i) a national overnight delivery service in which event delivery shall be deemed to occur the next Business Day after depositing the notice with such delivery service, or (ii) by facsimile transmission or electronic mail transmission in which event notice shall be deemed to occur the same day if given before 5:00 p.m. (Orange County, California time) on a Business Day and, if not so received, the next Business Day. The addresses and addressees to which notice is to be given may be changed by written notice given in the manner specified in this <u>Section 17(c)</u> and actually received by the addressee. Counsel to any party to this Agreement may, on behalf of its client, give any notice which may be, or is required to be, given by its client under this Agreement (and any notice so given by such counsel shall be as effective as if given by its client).

(d)     <u>Parties Bound</u>. This Agreement will be binding upon and will inure to the benefit of Buyer and Seller and their respective successors and permitted assigns. Any indemnity in favor of a party or its affiliates also will benefit each person who holds a direct or indirect ownership interest in such party or affiliate and the respective officers, directors, trustees, agents, employees and affiliates of such party or affiliate and such owners, and all such persons are third-party beneficiaries of this Agreement to the extent of their rights to indemnity under the related provision and may enforce that provision against Buyer or Seller, as applicable. Neither the Title Company, Buyer's Broker, nor Seller's Broker is a third-party beneficiary of this Agreement, nor may the Title Company, Buyer's Broker, or Seller's Broker enforce this Agreement or any obligation under this Agreement.

(e)     <u>Construction</u>. The Section headings contained in this Agreement are for convenience of reference only and are not intended to delineate or limit the meaning of any provision of this Agreement or be considered in construing or interpreting the provisions of this Agreement.

(f)     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which, taken together, will constitute one instrument. Buyer and Seller may execute different counterparts of this Agreement

and, if they do so, the signature pages from the different counterparts may be combined to provide one integrated document. Electronic signatures complying with California's Uniform Electronic Transactions Act (Cal. Civ. Code section 1633.1 et seq.) or other applicable law will be deemed original signatures. A copy of this Agreement bearing the signature of a Party that is transmitted by email, facsimile, or other means of electronic transmission (including as a .pdf file) shall constitute an enforceable original document for all purposes.

(g)   Entirety and Amendments. This Agreement embodies the entire agreement and understanding between Buyer and Seller with respect to its subject matter and supersedes all prior agreements and understandings, written and oral, between Buyer and Seller related to that subject matter, including any letter of intent. This Agreement and the obligations of the parties under this Agreement may be amended, waived, and/or discharged only by an instrument in writing executed by the party against which enforcement of the amendment, waiver or discharge is sought. Joinder of the Title Company, Buyer's Broker and/or Seller's Broker will not be necessary to make any amendment, waiver, or discharge effective between Buyer and Seller.

(h)   Invalidity. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or enforceability of the remaining provisions or of that provision under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted by law.

(i)   Assignment. Buyer shall not sell, transfer, convey, encumber or otherwise dispose of all or any part of this Agreement without the prior written consent of Seller, which consent may be withheld in Seller's reasonable discretion. For purposes of this Section 17(i), Buyer shall be deemed to have transferred its right, title and interest under this Agreement if any direct and/or indirect ownership interest in Buyer is sold, assigned, conveyed, transferred, encumbered or otherwise disposed of, in whole or in part, voluntarily or involuntarily. Notwithstanding the foregoing, Buyer may, at any time prior to the date which is ten (10) Business Days prior to the Closing, upon advance written notice to Seller, assign this Agreement without Seller's consent to a wholly-owned affiliate of Buyer. In the event of any assignment by Buyer, Buyer shall continue to remain fully liable hereunder as totally and completely as if such assignment had not occurred.

(j)   Governing Law. This Agreement will be governed by the laws of the State of California, without giving effect to principles of conflicts of law. If any provision of this Agreement is invalid or unenforceable, such provision shall (i) be modified to the minimum extent necessary to render it valid and enforceable, or (ii) if it cannot be so modified, be deemed not to be a part of this Agreement and shall not affect the validity or enforceability of the remaining provisions.

(k)   No Liability of Related Parties. No Related Entity of a Party, nor any person who holds a direct or indirect ownership interest in a Party or any Related Entity, nor any of the respective officers, directors, managers, members, partners, trustees, agents and employees of any such person shall have any liability, directly or indirectly, under or in connection with this Agreement, any document or certificate executed in connection with this Agreement (including the Seller Closing Documents or Buyer Closing Documents) or any amendment of any of the foregoing made at any time, whether prior to, contemporaneous with, or after this Agreement.

Each party and its successors and assigns, as well as all other persons, may look solely to assets of the other Party for the payment of any claim or any performance, and each Party, on behalf of itself and its successors and assigns, hereby waives any and all other claims, demands, causes of action and liability.

        (l)     Waiver of Jury Trial. BUYER AND SELLER EACH WAIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION BETWEEN THEM RELATED TO THIS AGREEMENT, THE TRANSACTION CONTEMPLATED HEREBY OR THE PROPERTY. The provisions of this Section 17(1) shall survive the Closing and any termination of this Agreement, and shall be deemed severed from this Agreement if determined not to be valid or enforceable.

        (m)     Time. Time is of the essence in the performance of this Agreement.

        (n)     Confidentiality. Prior to Closing, Buyer shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written consent of Seller; provided, however, that Buyer may, subject to the provisions of Section 5(e), make disclosure of this Agreement to its Permitted Outside Parties as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Buyer.

        (o)     No Recordation. Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum or affidavit by Buyer without the prior written consent of Seller shall constitute a default hereunder by Buyer, whereupon Seller shall have the remedies set forth in Section 12(a).

        (p)     Further Assurances. In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Buyer.

        (q)     Joint and Several Liability. In the event there are multiple assignees of Buyer who take title to the Property, the liability of such assignees with respect to the obligations of Buyer under this Agreement shall be joint and severable.

        (r)     Natural Hazards Disclosure. Buyer and Seller acknowledge that Seller may be required under California law to disclose if the Property lies within the following natural hazard areas or zones: (a) a special flood hazard area designated by the Federal Emergency Management Agency; (b) an area of potential flooding; (c) a very high fire hazard severity zone; (d) a wild land area that may contain substantial forest fire risks and hazards; (e) an earthquake fault zone; or (f) a seismic hazard zone. Buyer acknowledges that Seller will employ the services of the Title Company or another third party selected by Seller ("Natural Hazard Expert") to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill Seller's disclosure obligations, and to report the result of the

Natural Hazard Expert's examination to Buyer and Seller in writing. The written reports prepared by the Natural Hazard Expert regarding the results of the Natural Hazard Expert's examination fully and completely discharges Seller from Seller's disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1103.4 regarding non-liability of Seller for errors or omissions not within Seller's personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of the Natural Hazard Expert's expertise with respect to the examination and written report regarding the natural hazards referred to above.

      (s)    Alternative Dispute Resolution.

      (i)    Conflict of Terms. To the extent any terms in this Section 17(s) conflict with any terms elsewhere in this Agreement, the terms of this Section 17(s) shall govern the rights and obligations of the Parties.

      (ii)    Dispute Resolution. Whenever during the term of this Agreement or following termination or expiration of this Agreement, any disagreement or dispute arises between the Parties as to the interpretation of this Agreement or any rights or obligations arising hereunder, such matters shall be resolved in accordance with the procedures hereinafter set forth.

      (iii)    Meet and Confer. Any Party who asserts it has a claim, disagreement or grievance ("Dispute") against the other Party arising out of or related to this Agreement shall first notify the other Party in writing of such Dispute and request a meeting with the other Party. No later than seven (7) business days after receipt by the other Party of such notice, the parties, represented by executive level employees, shall meet and confer for a minimum of two (2) hours. This meeting shall be for the express purposes of (1) exchanging and reviewing all pertinent non-privileged document sand information relating to the matters and issues in dispute, (2) freely and candidly discussing each Party's position, and (3) reaching agreement upon a reasonable, compromise resolution of the Dispute.

      (iv)    Mediation. If the Dispute is not resolved to the satisfaction of both Parties by meeting and conferring, either Party may request mediation, which shall be compulsory upon the other Party. Mediation shall occur utilizing the services of a trained mediator, mutually agreed upon by both Parties, with at least five (5) years' experience in mediating contracts of the nature and type existing between the Parties, with costs for such mediation to be shared equally by the Parties. A Party shall request mediation by giving notice to the other; and shall have the responsibility to take steps to set up such mediation, which shall occur no later than twenty (20) days from receipt of notice by the other Party of a demand for mediation. The Parties shall share the costs of a mediator equally; and shall bear their respective legal costs.

*[Signature pages follow]*

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609AE9CF4B6

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609AB90F484

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER:**

**Heisler Laguna, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**694 NCH Apartments, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Retreat at Laguna Villas, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Sunset Cove Villas, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Duplex at Sleepy Hollow, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Cliff Drive Properties DE, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Laguna Festival Center, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**891 Laguna Canyon Road, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**777 at Laguna, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

**Laguna Art District Complex, LLC,**
a Delaware limited liability company

By: _Jason Miller_
Name: Jason Miller
Title:  Authorized Signatory

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F48A

**BUYER**:

**Special Assets Laguna LLC,**
a Delaware limited liability company

By: _____

Name:   John Anderson

Title:    Authorized Signatory

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

<u>ACKNOWLEDGEMENT AND AGREEMENT</u>

      Title Company (as defined in <u>Section 1</u> above) hereby acknowledges that it has received this Agreement executed by the Seller and Buyer and accepts the obligations of and instructions for the Title Company set forth in this Agreement.  Title Company, as escrow holder, agrees to receive, disburse and/or handle the Earnest Money, the Purchase Price and all closing documents in accordance with this Agreement.

CHICAGO TITLE COMPANY


By:     _____

Name:   Chris Miller

Title:    Title Rep

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F48A

SCHEDULE 1

Schedule 1

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

**EXHIBIT A**

**FORM OF DEED**

When recorded, return to:

_____

_____

_____

Attn: _____

DEED

FOR VALUE RECEIVED, [_____] ("Grantor"), grants to [_____] all that certain real property (the "Property") situated in the County of Orange, State of California, described on Schedule 1 attached hereto and by this reference incorporated herein.

THE PROPERTY IS CONVEYED TO GRANTEE SUBJECT TO:

(i)    the lien of all real estate taxes and assessments not yet delinquent as of the date hereof;

(ii)    all local, state and federal laws, rules, ordinances and governmental regulations, including but not limited to, building and zoning laws, rules, ordinances and regulations now or hereafter in effect relating to the Property; and

(iii)    all items appearing of record and all matters which would be disclosed by an accurate survey of the Property.

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

DATED as of this ____ day of _____, 2025.

**GRANTOR:**

[_____],
a [_____]

By: _____
Name: _____
Title: _____

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which
this certificate is attached, and not the
truthfulness, accuracy, or validity of that
document.

State of California                    )
                                       ) ss
County of _____           )

On _____, 2025 before me,

_____, a Notary Public, personally appeared

_____, who proved to me on the basis of satisfactory

evidence to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged

to me that he/she/they executed the same in his/her their authorized capacity (ies), and that by

his/her/their signature (s) on the instrument the person (s), or the entity upon behalf of which the person

(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____                    (SEAL)

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A6B0FABA

EXHIBIT A TO DEED
Legal Description

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609AF60F484

Exhibit B
Page 1

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

## EXHIBIT B
## FORM OF BILL OF SALE

For good and valuable consideration, [_____] ("Seller"), sells and conveys to [_____] ("Buyer"), the following (collectively, "Personalty"): all fixtures, equipment, machinery, building materials, supplies, inventory, and other tangible property owned by Seller and located on the Land (as defined below).  This Bill of Sale expressly excludes Personalty located on the Land that is leased or rented.

EXCEPT AS SET FORTH HEREIN OR IN THE PURCHASE CONTRACT, THE PERSONALTY IS TRANSFERRED TO BUYER "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS.  EXCEPT AS SET FORTH HEREIN OR IN THE PURCHASE CONTRACT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED,    STATUTORY    OR    OTHERWISE    (INCLUDING    WARRANTIES    OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PERSONALTY OR ITS CONDITION.    CONVEYANCE OF THE PERSONALTY IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT (AS DEFINED BELOW).

As used herein, (1) "Land" means that certain real property in Orange County, California, as described on Exhibit A attached to and made a part of this Bill of Sale for all purposes; and (2) "Purchase Contract" means the Purchase and Sale Agreement, dated as of _____, 2025, between Seller and Buyer.

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590543A

IN WITNESS WHEREOF, the Seller has executed this Bill of Sale this _____ day of _____, 2025.

**SELLER:**

[_____],
a [_____]

By: _____
Name: _____
Title: _____

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement"), dated _____, 2025, is executed by and between [_____] ("Seller"), and [_____] ("Buyer").

1.    Background. Seller and Buyer have entered into a Purchase and Sale Agreement, dated as of _____, 2025 (the "Purchase Contract"), pursuant to which Seller is conveying to Buyer the real property commonly known as "[_____]" (the "Property"), located in the County of Orange, State of California. All capitalized terms in this Agreement, if not defined in this Agreement, will have the meaning ascribed to them in the Purchase Contract. Buyer has agreed to execute and deliver this Agreement pursuant to the Purchase Contract and this Agreement shall survive Closing under the Purchase Contract.

2.    Assignment. Seller assigns Buyer the following (collectively, the "Miscellaneous Assets"): (a) all right, title and interest of Seller in, to and under any assignable contract listed in Exhibit C-1 attached to and by reference made a part of this Assignment (collectively, "Assigned Contracts"); (b) all right, title and interest of Seller in and to all transferable permits, licenses, approvals, utility rights, development rights and similar rights related to the Property, if any, whether granted by governmental authorities or private persons; and (c) all right, title and interest of Seller in and to all assignable warranties and guaranties covering all or any part of the Property, excluding warranties or guaranties provided by Seller or any Related Entity, it being the intent of the parties hereto that no such warranties or guaranties are being provided by Seller or any Related Entity. The Miscellaneous Assets shall not include any internet addresses or websites used in connection with the Property. Seller makes no representation or warranty relating to any of the Miscellaneous Assets or the assignability thereof and shall not be required to obtain any consents relating to such assignment.

EXCEPT FOR REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE PURCHASE CONTRACT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE MISCELLANEOUS ASSETS OR THE ASSIGNABILITY OF THE MISCELLANEOUS ASSETS. CONVEYANCE OF THE MISCELLANEOUS ASSETS IS SUBJECT TO ALL DISCLAIMERS, WAIVERS, RELEASES AND OTHER LIMITATIONS CONTAINED IN THE PURCHASE CONTRACT.

3.    Assumption. Buyer hereby assumes and agrees to pay and perform all of the terms, covenants, conditions and obligations of Seller or the owner of the Property under or with respect to the Assigned Contracts to the extent those terms, covenants, conditions and obligations are to be performed on or after the date of this Agreement.

4.    Purchase Contract Not Affected. The obligations of Buyer under this Agreement have no effect on any obligations (whether similar or dissimilar) that Buyer has under the Purchase

Exhibit C
Page 1

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

Contract. The undertakings of Buyer in this Agreement and the Purchase Contract shall be independent of each other. This Agreement shall not in any manner affect, limit, modify or amend the disclaimers, waivers and releases benefiting Seller and the Related Entities set forth in the Purchase Contract.

Exhibit C
Page 2

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A590F4BA

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement this __ day of _____, 2025.

**SELLER:**

[_____],
a [_____]

By:    _____
Name:  _____
Title: _____


**BUYER**:

[_____],
a [_____]

By:    _____
Name:  _____
Title: _____

Exhibit C
Page 3

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609ABC0548A

Docusign Envelope ID: 54E12D44-AF9C-4E95-ACDE-3609A500F4BA

Exhibit C-1 to Assignment and Assumption Agreement

Assigned Contracts

———

Exhibit C-1
Page 1